UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND DIVISION

| | |
|---|---|
| NISHAL CHANDERPAUL,<br><br>Plaintiff,<br><br>vs.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.<br><br>Defendant. | Civil Case No. 1:24-cv-01838<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Nishal Chanderpaul ("Plaintiff") a living, breathing 39-year-old consumer, brings this action on an individual basis, against Experian Information Solutions, Inc. ("Defendant" or "Experian") and states as follows:

### INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant Experian acknowledges this potential for misuse and resulting damage every time it sells its credit monitoring services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals" credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. Defendant Experian Information Solutions, Inc., together with non-parties Equifax Information Services LLC ("Equifax"), and, Trans Union LLC ("Trans Union"), are the three major credit reporting bureaus in the United States.

5. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

6. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*. ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

7. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

15 U.S.C. § 1681(a)(1).

8. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)] (emphasis added).

9. The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

10. In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

11. The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items

3

of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

12. Plaintiff's claims arise out of Defendant's blatantly inaccurate credit reporting, wherein Defendant Experian reported to Plaintiff's potential creditors that he is "deceased" and does not have a credit score.

13. Accordingly, Plaintiff brings claims against Defendant Experian for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

14. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys" fees from the Defendant Experian for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, as described herein.

## PARTIES

15. Plaintiff Nishal Chanderpaul is a natural person residing in Queens, New York, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16. Defendant Experian Information Solutions, Inc. ("Defendant" or "Experian") is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626, and is authorized to do business in the State of New York, including within this District.

17. Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating

information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

20. The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

21. The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

22. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

23. To that end, the FCRA mandates that consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports *See* 15 U.S.C. § 1681e(b).

24. The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**Defendant's Practice Concerning the Sale of Reports on the "Deceased"**

25. Defendant Experian sells millions of consumer reports (often called "credit reports" or "reports") per day, and also sells credit scores.

26. Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant Experian, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27. Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendant Experian, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

28. Defendant Experian routinely places a "deceased" notation or marking on reports when it is advised by any of its many data furnishing sources (such as banks, debt collectors, etc.) that a given consumer is deceased.

29. Defendant Experian's furnishing sources identify "deceased" consumers by marking the "status" of such consumer's responsibility for any subject account with an "X" or "U/UNDESIGNATED" code in the "ECOA" field of an electronic data input format used in the credit reporting industry, known as Metro or Metro 2.

30. Defendant Experian does not request or require a death certificate from any of their data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

31. Defendant Experian does not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

32. Defendant Experian does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

33. In some cases, in order to assure accuracy, Defendant Experian may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendant Experian does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when an "X" or "U/UNDESIGNATED" deceased code is furnished to them to be placed in said consumer's credit file or report.

34. The Social Security Administration ("SSA") maintains the Death Master File ("DMF"). The DMF is also known commercially as the Social Security Death Index ("SSDI"). As of 2018, the DMF contained information on 111 million deaths that have been reported to the SSA. The DMF is created from internal SSA records of deceased persons possessing social security numbers and whose deaths were reported to the SSA. The DMF includes the following information on each decedent, if the data are available to the SSA: social security number, name, date of birth, and date of death.

35. Federal legislation (i.e., the Social Security Act) precludes the sharing of the full DMF with non-benefits paying agencies.

36. Because of the wide use and demand for death records for a variety of industries, SSA has partnered with the U.S. Department of Commerce's National Technical Information Service ("NTIS") to release the Limited Access Death Master File ("LADMF") electronically on a weekly and monthly basis.

37. The SSA receives death reports from many sources, including family members, funeral homes, financial institutions, postal authorities, state information, and other federal agencies. The SSA does not have a death record for all persons; therefore, the SSA does not guarantee the veracity of the DMF. The SSA does not guarantee 100% of the data.

38. The SSA estimates that roughly 12,000 living people are added to the DMF annually, potentially due to clerical error. An erroneous listing can lead to not only a cessation of government benefits, but also the freezing of bank accounts, the inability to buy or rent property, and mistaken accusations of identity theft.[1]

39. The Office of the Inspector General called the error rate "very low," but noted that "SSA's erroneous death entries can lead to mistaken benefit terminations and cause severe financial hardship and distress to affected people…when errors like this occur, it can be a long and difficult process to resurrect your financial health.[2]

---

[1] *Aviva Dekornfeld (2018-06-20). "The Plight of the Living Dead". The Indicator from Planet Money (Podcast); see also* Bichell, Rae Ellen (2016-08-10). "Social Security Data Errors Can Turn People into the Living Dead". *National Public Radio*.

[2] "Cases of Mistaken Death Reports Low but Costly | Office of the Inspector General, SSA". *oig.ssa.gov*. 2016-03-24. Archived from the original on 2020-07-16.

40. Defendant Experian does not have access to the full DMF from the SSA, but rather are subscribers to the NTIS LADMF.

41. Although it subscribes to the NTIS LADMF, Defendant Experian does not cross-reference the "X" or "U/UNDESIGNATED" codes received from data furnishers with the LADMF to determine whether any given consumer reported as deceased via a furnishing source is also on the LADMF before selling a credit report about said consumer, or at any time.

42. Defendant Experian will only cross-reference the NTIS LADMF to sell additional products for an additional fee to its subscribers regarding information contained within the LADMF.

43. Defendant Experian fails to employ reasonable procedures that assure that a consumer is actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

44. Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant Experian does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark in that consumer's file.

45. Even in instances where the purportedly deceased consumer communicates directly with Defendant Experian, Defendant Experian does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark on that consumer's report.

46. Once a "deceased" mark is placed upon a consumer's report, Defendant Experian will not calculate and will not provide a credit score for that consumer.

47. When Defendant Experian sells a consumer report with a "deceased" mark to third parties, Defendant Experian never calculates or provides a credit score for that consumer and instead reports that consumer's credit score as "N/A."

48. Defendant Experian knows that third-party credit issuers require a credit score to process credit applications.

49. Defendant Experian knows that consumers without credit scores are unable to secure any credit from most credit issuers.

50. Defendant Experian knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased" and without a credit score.

51. Defendant Experian has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendant Experian is inaccurately reporting them as "deceased" and without a credit score.

52. Defendant Experian has received and documented many disputes from consumers complaining that Defendant Experian had erroneously marked them as "deceased" on their credit reports.

53. Defendant Experian knows that thousands of consumers are erroneously marked as "deceased" on their credit reports via an erroneous furnishing of the "X" or "U/UNDESIGNATED" code.

54. Nevertheless, Defendant Experian does not employ any procedures to assure that a consumer is actually deceased before adding a "deceased" notation to that consumer's credit file and credit reports.

55. Even consumers who dispute the erroneous "deceased" status on their credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" or "U/UNDESIGNATED" code in the first instance modifies its reporting first.

56. Defendant Experian does not have any independent procedure to change an erroneous deceased status on their own and will merely parrot its furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report, a reinvestigation which is triggered by a consumer dispute.

57. Nor does Defendant Experian employ any procedures to limit or stop the furnishing of reports to third parties for consumers that it has marked as "deceased" under any circumstances.

58. For years after a consumer's actual death, Defendant Experian will continue to sell credit reports about that consumer.

59. Defendant Experian will only remove a deceased consumer's file from its credit reporting databases when it is no longer valuable to it—meaning that no one is continuing to purchase reports about that consumer.

60. Defendant Experian charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

61. Defendant Experian profits from the sale of reports on deceased consumers.

62. Defendant Experian has in its credit reporting databases many "deceased" tradelines corresponding to distinct credit files for individual consumers that it has marked as "deceased."

63. Defendant Experian knows that truly deceased consumers do not apply for credit.

64. Defendant Experian knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using

the personal identifying information of deceased consumers is known to Defendant Experian to be a common and major source of identity theft.

65. Defendant Experian knows that identity theft and credit fraud are serious and widespread problems in our society.

66. Defendant Experian warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased and require relatives to provide a death certificate or executorship papers, among other forms of proof, before accessing the deceased consumer's credit information or report.

67. Defendant Experian has no similar death certificate, executorship paper, or any other proof requirements for its data sources, which report a consumer as deceased or for the purchasers of its reports who access the purportedly deceased consumer's information.

68. Defendant Experian sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

69. For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for Defendant Experian to sell their credit reports, absent a court order.

70. Defendant Experian knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Plaintiff Applies for Credit Account with Discover**

71. On or about September 27, 2023, Plaintiff sought to obtain credit to help meet his everyday needs and financial obligations.

72. On or around September 27, 2023, Plaintiff completed and submitted a credit application for a credit card with Discover Bank ("Discover").

73. For Discover to evaluate Plaintiff's creditworthiness, it would need to obtain copies of his credit files. Plaintiff provided Discover with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

74. On or around September 27, 2023, Experian sold a credit report about Plaintiff to Discover in response to Plaintiff's credit application.

**Discover Denies Plaintiff's Credit Application**

75. On or about September 27, 2023, Discover received and reviewed Experian's consumer report about Plaintiff.

76. Shortly after submitting his credit application, on or about September 27, 2023 Discover denied Plaintiff's credit application in reliance on information contained in the Experian consumer report about Plaintiff.

77. Due to the Defendant Experian's inaccurate reporting, Plaintiff was not offered any credit.

78. Thereafter, in or around October 2023, Plaintiff contacted Discover to determine why Plaintiff's credit application was denied.

79. Upon information and belief, the Discover representative informed Plaintiff that based on the consumer information provided by Defendant Experian, "there was nothing still reporting to verify his current information."

80. Upon information and belief, the reason why Plaintiff's Discover credit application was denied was a result of Defendant Experian reporting Plaintiff as deceased.

81. Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

82. Ultimately, Plaintiff was embarrassed and humiliated that he could not obtain credit to help supplement his everyday needs and financial obligations.

**Plaintiff's Disputes to Defendant Experian Regarding the Inaccurate Credit Reporting**

83. In or about October 2023, extremely embarrassed by the denial, Plaintiff attempted to obtain his consumer file online from Experian through annualcreditreport.com.

84. However, Plaintiff was unable to secure a copy of his Experian consumer file online through annualcreditreport.com.

85. Frustrated, in or around October 9, 2023 ("October 2023 dispute"), Plaintiff sent a letter to Defendant Experian to obtain a copy of his consumer file, to identify and dispute any inaccurate reporting on his consumer report.

86. Within the October 2023 letter, Plaintiff explained that he was unable to secure a copy of his consumer report from Experian online.

87. Plaintiff informed Defendant Experian that he suspected there was an inaccuracy in Experian's consumer report about Plaintiff as he was recently denied credit that he reasonably believes he otherwise should have been granted.

88. Plaintiff requested that Defendant Experian send him a copy of his credit report.

89. Plaintiff never heard back from Experian regarding his request.

**Plaintiff Obtains His Credit Reports and Confirms the Deceased Notation in His Experian Credit File**

90. On or about January 8, 2024, Plaintiff was finally able to secure a copy of his credit file from Experian.

14

91. Upon review, Plaintiff saw that there was a deceased notation on his Experian credit files.

92. Plaintiff, being very much alive, and never deceased, was terribly upset and reasonably believes that Experian's inaccurate reporting that Plaintiff was deceased was the basis for the Discover credit denial.

93. Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

94. Plaintiff reasonably believes that Defendant Experian continues to publish that Plaintiff is deceased in the credit reports it issues about Plaintiff.

95. As a result of the "deceased" notation, Defendant Experian made it practically impossible for Plaintiff to continue to obtain credit.

96. At all times pertinent hereto, Defendant Experian was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

97. At all times pertinent hereto, the conduct of Defendant Experian, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

98. As a standard practice, Defendant Experian does not conduct independent investigations in response to consumer disputes. Instead, Defendant Experian merely parrots the response of the credit furnisher despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received

from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

99. Defendant Experian is aware of the shortcomings of its procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, Defendant Experian's violations of the FCRA are willful.

100. As a result of Defendant Experian's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

101. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

102. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows: "Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable

procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates." 15 U.S.C. §1681e(b) (emphasis added).

103. On at least one occasion, Defendant Experian prepared patently false consumer reports concerning Plaintiff.

104. Despite actual and implied knowledge that Plaintiff is not dead, Defendant Experian readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

105. Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

106. As a result of Defendant Experian's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

107. Defendant Experian's conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant Experian negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

108. Plaintiff is entitled to recover attorneys" fees and costs from Defendant Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

i. Determining that Defendant negligently and/or willfully violated the FCRA;

ii. Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding Plaintiff reasonable attorneys" fees and costs as provided by the FCRA; and,

iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Dated: March 12, 2024,            **CONSUMER ATTORNEYS**

By: */s/ Moshe Boroosan*
Moshe Boroosan, Bar No. 5429915
CONSUMER ATTORNEYS
1318 Avenue J, 2nd Floor,
Brooklyn, NY 11230
T: (718) 887-2926
F: (718) 715-1750
Email: mboroosan@consumerattorneys.com

*Attorneys for Plaintiff Nishal Chanderpaul*